1
2
3
4

**LOUIS R. DUMONT – State Bar No. 130198**
**DANIELLE C. FOSTER – State Bar No. 281385**
**CARPENTER, ROTHANS & DUMONT**
**500 S. Grand Avenue, 19th Floor**
**Los Angeles, CA  90071**
**(213) 228-0400 / (213) 228-0401 (fax)**
**ldumont@crdlaw.com / dfoster@crdlaw.com**

5
6

Attorneys for Defendant Beaumont Unified School District,
a public entity

7

8          **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  Y.M. by and through her guardian ad litem NANCY P., | ) Case No.: 5:19-cv-1048-FLA-SP |
| 12 | ) |
| 13          Plaintiff, | ) **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| 14          vs. | ) |
| 15  BEAUMONT UNIFIED SCHOOL DISTRICT, a California public entity, and DOES 1 through 10, inclusive, | ) |
| 16 | ) |
| 17          Defendants. | ) Fed. R. Civ. P. 56 |
| 18 | ) |
| 19 | ) DATE: April 16, 2021 |
| 20 | ) TIME: 10:30 a.m. |
| 21 | ) COURTROOM: 6B |
| 22 | ) **U.S. District Judge** |
|  | ) **Hon. Fernando L. Aenlle-Rocha** |

23          PLEASE TAKE NOTICE that on April 16, 2021, 10:30 a.m., in Courtroom

24   6B of the United States District Court for the Central District of California located

25   at 350 W. 1st Street, Los Angeles, California 90012, Defendant Beaumont Unified

26   School District ("BUSD"), a public entity, will and hereby does move the Court as

27   follows:

28

- 1 -
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1.    For summary judgment in favor of Defendant Beaumont Unified School District, and against Plaintiff Y.M., where the plaintiff cannot establish the existence of a genuine issue of material fact as to any claim asserted against the defendant.

2.    If, for any reason, summary judgment cannot be had, for partial summary judgment/adjudication of the following issues and claims:

        a.    As to the first claim for "Discrimination under the Americans with Disabilities Act: Failure to Provide Access to Programs and Activities" where the uncontroverted evidence affirmatively negates the elements of that claim.

        b.    As to the second claim for "Discrimination Under Section 504 of the Rehabilitation Act: Failure to Provide Access to Programs and Activities" where the uncontroverted evidence affirmatively negates the elements of that claim.

        c.    Plaintiff is not entitled to monetary damages.

        d.    Plaintiff is not entitled to injunctive relief.

        e.    Plaintiff is not entitled to declaratory relief.

        f.    Some of the alleged conduct that forms the basis for plaintiff's claims is barred by the statute of limitations.

This motion is made following a pre-filing conference of counsel, which took place on February 22, 2021, pursuant to Local Rule 7-3.

///

///

///

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

This motion will be made and based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the pleadings and records on file with this court, any evidence of which the Court may take judicial notice prior to or at the hearing of this matter, and upon such oral or documentary evidence as may be presented at the hearing of this motion.

DATED: March 12, 2021                    CARPENTER, ROTHANS & DUMONT

                                                          /s/ Danielle C. Foster

                                        By: _____
                                             LOUIS R. DUMONT
                                             DANIELLE C. FOSTER
                                             Attorneys for Defendant

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ...............................................................................................1

II.   STATEMENT OF FACTS ...............................................................................1

III.  PLAINTIFF'S CLAIMS ...............................................................................5

IV.  LEGAL STANDARD ON SUMMARY JUDGMENT ...............................6

V.   STATEMENT OF LAW ...............................................................................7

      A.    The Undisputed Evidence Affirmatively Negates the Elements of Plaintiff's Remaining Claims ...............................................7

      B.    Plaintiff Cannot Demonstrate that She is Entitled to the Relief She Seeks ...............................................................................13

      C.    To the Extent Plaintiff's Claims are Based on Alleged Harassment and Bullying, Those Claims are Also Subject to Summary Judgment ...............................................................15

      D.    Some of the Alleged Conduct that Forms the Basis for Plaintiff's Claims is Barred by the Statute of Limitations ...............20

VI.  CONCLUSION ...............................................................................................21

TABLES OF CONTENTS AND AUTHORITIES

# TABLE OF AUTHORITIES

**Cases**

<u>A.G. v. Paradise Valley Unified Sch. Dist. No. 69</u>, 815 F.3d 1195
  (9th Cir. 2016) .................................................................8, 9, 10, 16

<u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970) ..................................6

<u>Alexander v. Choate</u>, 469 U.S. 287, 105 S. Ct. 712 (1985) ....................12

<u>Alexopulos By and Through Alexopulos v. San Francisco</u>
  <u>Unified Sch. Dist.</u>, 817 F.2d 551 (9th Cir.1987)...............................25

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986) ............................6

<u>Antelope Valley Allied Arts Ass'n v. Lancaster Redevelopment Agency</u>,
  No. CV1010039DSFFMOX, 2012 WL 13006002 (C.D. Cal. Feb. 6, 2012) ......18

<u>C.O. v. Portland Pub. Sch.</u>, 679 F.3d 1162 (9th Cir. 2012) ....................9

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986) .............................6, 7

<u>City of L.A. v. Lyons</u>, 461 U.S. 95 (1983).............................................17

<u>Cmty. Coll. v. Davis</u>, 442 U.S. 397 (1979) .........................................10

<u>Coral Const. Co. v. King Cnty.</u>, 941 F.2d 910 (9th Cir. 1991) ...............18

<u>Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.</u>,
  526 U.S. 629 (1999) ...............................................................19, 24

<u>Daviton v. Columbia/HCA Healthcare Corp.</u>, 241 F.3d 1131 (9th Cir. 2001) .......25

<u>Douglas v. California Dep't of Youth Auth.</u>, 271 F.3d 812 (9th Cir.) ...................25

<u>Duvall v. Cty. of Kitsap</u>, 260 F.3d 1124 (9th Cir. 2001) .......................16

<u>Fortyune v. Am. Multi-Cinema, Inc.</u>, 364 F.3d 1075 (9th Cir. 2004)....................17

<u>Galdamez v. Potter</u>, 415 F.3d 1015 (9th Cir. 2005) ..........................23, 24

<u>Halpern v. Wake Forest Univ. Health Sciences</u>, 669 F.3d (4th Cir. 2012).............10

<u>Hiser v. Hickel</u>, 100 F.3d 962 (9th Cir. 1996)......................................18

<u>K.M. ex rel. Bright v. Tustin Unified Sch. Dist.</u>, 725 F.3d 1088 (9th Cir. 2013).....9

<u>Knapp v. Nw. Univ.</u>, 101 F.3d 473 (7th Cir. 1996) ...............................13

Lance v. Lewisville Indep. Sch. Dist., 743 F.3d 982 (5th Cir. 2014) ....................24

Mark H. v. Hamamoto, 620 F.3d 1090 (9th Cir. 2010)...........................................10

Mark H. v. Lemahieu, 513 F.3d 922 (9th Cir. 2008) ................................................8

Mgmt., Inc., 871 F. Supp. 2d 944 (N.D. Cal. 2012)................................................23

Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,

   210 F.3d 1099 (9th Cir. 2000)................................................................................7

O'Shea v. Littleton, 414 U.S. 488 (1974)................................................................17

Payan v. Los Angeles Cmty. Coll. Dist., No. 2:17-CV-01697-SVW-SK,

   2018 WL 6164269 (C.D. Cal. Oct. 16, 2018)......................................................12

Rodgers v. Tilton, No. CIVS-07-2269WBSDADP, 2010 WL 3504903

   (E.D. Cal. Sept. 7, 2010) .....................................................................................18

S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty., 819 F.3d 69 (4th Cir. 2016) .....20

S.E.C. v. Seaboard Corp., 677 F.2d 1301 (9th Cir. 1982)........................................6

S.S. v. E. Kentucky Univ., 532 F.3d 445 (6th Cir. 2008) ..................................19, 24

Sharkey v. O'Neal, 778 F.3d 767 (9th Cir. 2015)...................................................25

**Statutes**

29 U.S.C. § 794(a) ....................................................................................................7

42 U.S.C. § 12132......................................................................................................7

42 U.S.C § 12131(2) ..................................................................................................8

TABLES OF CONTENTS AND AUTHORITIES

1

<u>**MEMORANDUM OF POINTS & AUTHORITIES**</u>

2

**I.   <u>INTRODUCTION</u>**

3   This lawsuit is the epitome of the familiar idiom that no good deed goes

4   unpunished.  Plaintiff Y.M. was born with a Trisomy disorder, which caused

5   delayed development and severe cognitive disabilities.  Nonetheless, when Y.M.'s

6   mother requested that Y.M. be allowed to participate in cheerleading at Beaumont

7   High School ("BHS") in 2015, her request was granted.  Y.M. was allowed to join

8   the J.V. team in July 2015, at the beginning of her freshman year.  Plaintiff was a

9   member of the J.V. sideline cheer team at BHS for her freshman, sophomore, and

10  junior years.  In her senior year, Y.M. was placed on the Varsity team.  In each

11  season, Y.M. was permitted to participate without having to try out, like every

12  other student had to.  During all four years that Y.M. cheered at BHS, the BHS

13  staff paid for and provided her with a one-on-one cheer aide, who assisted Y.M. at

14  all cheer practices and games.  The BHS cheer coaches also accommodated Y.M.

15  in a variety of other ways, such as creating videos and changing the structure of

16  cheer practice to maximize Y.M.'s practice time.  And they modified several of

17  their policies to help Y.M. feel more included.

18  Nonetheless, Y.M.'s mother brought the instant lawsuit against Beaumont

19  Unified School District claiming that Y.M. was discriminated against because she

20  was prohibited from participating in cheerleading at BHS and because BHS staff

21  failed to accommodate Y.M.'s disabilities.  This action is entirely meritless,

22  arguably frivolous, and, in light of the undisputed evidence, ripe for adjudication

23  by way of summary judgment.

24  **II.   <u>STATEMENT OF FACTS</u>**

25  ***Plaintiff's Disability and Level of Functioning***

26  Plaintiff Y.M. is presently a 19-year-old female, who resides with her

27  mother, Nancy Piper.  Y.M. was born with a Trisomy disorder (i.e., she has an

28  additional chromosome), which has caused profound development delays and

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

severe receptive and expressive cognitive disabilities.  Facts 1-3.  Presently, at the age of 19, Y.M. has the mental acuity and cognitive function of a three- or four-year-old child.  Her speech is limited to simple sentences and phrases with 1-6 words to express her immediate wants and needs.   Y.M.'s ability to perceive, conceptualize, plan, and organize movements is also impaired.  She does not perform consistently in daily tasks where her quality of work varies widely, she frequently cannot perform tasks in proper sequences, and she finds it difficult to complete tasks with multiple steps.  Y.M. requires 24-hour care and constant supervision.  She requires assistance in all of her in her day-to-day activities, such as bathing and getting dressed.  Facts 4-9.  As such, Y.M. has been identified as a student with special needs and has received special education services though an Individualized Education Program ("IEP") since entering school in 2004.  Facts 8-9.

In the summer of 2015, Y.M. transitioned from junior high to high school and attended BHS.  During all four years at BHS, Y.M. continued to receive special education services and was assigned to a Special Day Class ("SDC") for moderate-to-severe handicapped students, and was allowed to participate in a couple of general education classes with the help of a one-on-one instructional aide.  Facts 10-12.  Shortly after Y.M.'s enrollment at BHS, her mother, Nancy Piper, requested that Y.M. be allowed to participate in the school's cheerleading program.  Fact 32.

### Cheerleading at BHS

The cheerleading program at BHS is highly competitive.  The BHS Spirit Program consists of "sideline" cheer, Junior Varsity ("J.V.") and Varsity.  There is also a "competition" cheer team that travels to compete in competitions.  The make-up of each team is dependent upon skill level.  The "sideline" cheer teams are responsible for cheerleading at high school sporting events and pep rallies. Those who wish to become a sideline cheerleader must: (1) attend a mandatory

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1   meeting with a parent in April; (2) complete documents including an application, a
2   financial commitment form, a photo release form, and a sports participation
3   packet; (3) pass a physical; (4) obtain four reference letters from four different
4   teachers; (5) attend a week-long clinic in May wherein they learn and practice a
5   particular cheer routine to perform at "tryouts"; and (6) attend "tryouts" and be
6   selected to a team.  Facts 16-17.

7       At tryouts, each applicant performs their routine before a panel of judges
8   composed of the cheer coaches and professional cheerleaders affiliated with one of
9   the professional cheerleading organizations (USA/USC/NCA).  Applicants are
10  scored based on a point system and evaluated on their stunting skills, dance
11  technique, precision and sharpness of movement, rhythm and timing,
12  showmanship, execution/memory, voice projection, energy/enthusiasm,
13  confidence, as well as jumps and tumbling.  Those cheerleaders with the highest
14  scores are invited to participated on the Varsity team (regardless of grade level)
15  and those with mid-range scores are invited to participate on the J.V. team. The
16  remaining students are cut and do not make either team.  Those who make a team
17  are required to maintain a 2.0 GPA, attend cheer camp over the summer, attend all
18  practices and games, and participate in fund raisers.  The cheerleader's parents are
19  requested to also participate in the Spirit Booster Club who assist with fundraising.
20  Facts 18-21.

21      In late fall, the "competition" cheerleading season also begins.  Cheerleaders
22  on the competition cheer team travel all both in state and out-of-state to compete in
23  cheerleading competitions involving high level stunting, tumbling, cheer routines,
24  and dance routines.  Those who wish to compete, including those members of
25  "sideline" cheer, must attend a second tryout and make the team by achieve the
26  highest scores in the areas of stunting, tumbling, dancing, and cheering.
27  Competition cheerleading requires a very high level of athleticism, strength,
28  technique, and skill.  The team is composed of only those with the highest skill set.

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1  Everyone on the competition cheer team must, at a minimum, be able to stunt.  The
2  competition cheer team would not be able to meaningfully compete with any
3  chance of doing well at a competition unless all team members stunt and/or
4  tumble.  Thus, many sideline cheerleaders who try out for the competition team do
5  not make the team.  Facts 24-26.

6      The sideline cheer teams hold practices three days per week to condition and
7  practice cheer routines for games and rallies.  In late fall and winter, those students
8  who make the competition cheer team also begin practicing five days per week.
9  Facts 22, 28.

10  ***Plaintiff's Participation in Cheerleading at BHS***

11      When Plaintiff Y.M.'s mother requested that her daughter be allowed to
12  participate in cheerleading at BHS in 2015, she met with school officials and her
13  request was granted.  In light of Y.M.'s circumstances, she was allowed to join the
14  J.V. team at the beginning of her freshman year.  Unlike other prospective
15  cheerleaders at BHS, Y.M. was placed on the J.V. team without having to try out.
16  Plaintiff was made a member of the J.V. sideline cheer team for her freshman,
17  sophomore, and junior years.  In her senior year, Y.M. became a member of the
18  Varsity team.  In each season, Y.M. was accommodated and permitted to
19  participate without having to meet the requirements noted above, like all other
20  students.  Facts 32-41.

21      Given Y.M.'s physical and cognitive limitations, it was understood by all,
22  including Y.M.'s parents, that Y.M. would not be participating in stunting or
23  tumbling, and she would not compete on the competition cheer team (which
24  required stunting) for the safety of herself and the other cheerleaders.  Fact 42.  In
25  fact, Y.M.'s mother, Nancy Piper, specifically told BHS staff that she wanted Y.M.
26  to cheer, "as long as she does not compete."  Fact 36.  And Y.M.'s primary care
27  physician cleared Y.M. for participation in cheer with the understanding that Y.M.
28  would not be engaging in stunting, due to safety concerns.  Fact 44.  Thus, Y.M.

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

did not attend or participate in the stunting/tumbling portion of practices, she did not attend cheer practices solely dedicated to stunting and/or tumbling, she was not on the competition cheer team, and she did not engage in tumbling runs or stunting at games or rallies.  Fact 47.  Y.M. did participate in cheer practices (that did not involve tumbling or stunting), she cheered at sporting events, and she participated in cheer events, such as cheer parties, parades, and pep rallies.  Fact 46.

Once Y.M. was part of the team, BHS school and cheer staff went above and beyond to the call of duty to further assist Y.M. to help her be successful.  For example, the school paid for Y.M. to have a one-on-one aide for cheer, who attended all practices and games.  Facts 54-59.  The cheer coaches also created cheer videos and altered the structure of cheer practice to maximize Y.M.'s practice time.  Facts 63-64.  They also modified team policies to help Y.M. feel more included.  For example, the coaches had a strict policy that all cheerleaders at BHS who missed a practice or did not fully memorize all cheers were prohibited from cheering at games. They did not apply this policy to Y.M., who was permitted to miss practices and was still allowed to cheer at games.  The coaches also had a policy that required all BHS cheerleaders to complete a certain number of hours of community service in order to "letter" in cheerleading.  They did not require Y.M. to complete any community service and they still gave her a "letter" in cheerleading.  Facts 65-66.

III.   **PLAINTIFF'S COMPLAINT AND CLAIMS**

The Complaint for Damages only contains two remaining claims against Defendant Beaumont Unified School District:

1.   "Discrimination Under the Americans with Disabilities Act: Failure to Provide Access to Programs and Activities"; and

2.   "Discrimination Under Section 504 of the Rehabilitation Act: Failure to Provide Access to Programs and Activities."

///

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

All of the other claims set forth in the Complaint have been dismissed with prejudice.  See Doc 40.

## IV.   LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party has the initial burden of showing summary judgment is proper by either providing evidence that shows there is no genuine issue of material fact, or by stating the absence of a genuine issue of material fact.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); Celotex, 477 U.S. at 322.  An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  An issue is material only if it "affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth."  S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982).

A moving party meets its initial burden of production by "produc[ing] evidence negating an essential element of the nonmoving party's claim or defense or show[ing] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party meets the burden of production, the burden shifts to the nonmoving party to "produce enough evidence to create a genuine issue of material fact."  Id. at 1103, citing Celotex, 477 U.S. at 322.  If no genuine issue of material fact exists, summary judgment should be granted.  Celotex, 477 U.S. at 323-24.

///

///

///

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

V. **STATEMENT OF LAW**

    A.    **The Undisputed Evidence Affirmatively Negates the Elements of Plaintiff's Remaining Claims.**

       Section 504 of the Rehabilitation Act "is concerned with discrimination in the provision of state services to all individuals with disabilities." A.G. v. Paradise Valley Unified Sch. Dist. No. 69, 815 F.3d 1195, 1203 (9th Cir. 2016). It states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Section 504 applies to public schools that receive federal financial assistance. Id. § 794(b)(2)(B); see also A.G., 815 F.3d at 1203; Mark H. v. Lemahieu, 513 F.3d 922, 929 (9th Cir. 2008).

       "Title II of the ADA was modeled after section 504 of the Rehabilitation Act." A.G., 815 F.3d at 1203. It states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Although section 504 of the Rehabilitation Act and Title II of the ADA differ to some extent, (see A.G., 815 F.3d at 1203–04; K.M. ex rel. Bright v. Tustin Unified Sch. Dist., 725 F.3d 1088, 1099 (9th Cir. 2013); C.O. v. Portland Pub. Sch., 679 F.3d 1162, 1168 (9th Cir. 2012)), they can be considered together where, as here, their relevant rules and applications are similar. See A.G., 815 F.3d at 1204.

       A plaintiff bringing suit under section 504 or Title II of the ADA must show: (1) she is a qualified individual with a disability; (2) she was denied meaningful access or denied a reasonable accommodation that she needs in order to enjoy meaningful access to the benefits of public services; and (3) the program providing the benefit receives federal financial assistance. Id.; Mark H. v.

1   Hamamoto, 620 F.3d 1090, 1097 (9th Cir. 2010).  Here, the District is entitled to

2   summary judgment because the undisputed evidence affirmatively negates the first

3   and second elements.

4            **1.**      **Y.M. is Not a Qualified Individual.**

5       Under the express provisions of the ADA, "[t]he term 'qualified individual'

6   means an individual with a disability who, with or without reasonable

7   modifications . . . meets the essential eligibility requirements for the receipt of

8   services or the participation in programs or activities provided by a public entity."

9   42 U.S.C § 12131(2).  As explained by the Supreme Court, "[a]n otherwise

10   qualified person is one who is able to meet all of a program's requirements in spite

11   of his handicap."  Se. Cmty. Coll. v. Davis, 442 U.S. 397, 406 (1979).  To satisfy

12   this burden, a plaintiff must present sufficient evidence to show: (1) that he or she

13   could satisfy the essential eligibility requirements of the program, and (2) if not,

14   whether any reasonable accommodation would enable the plaintiff to meet these

15   requirements.  Halpern v. Wake Forest Univ. Health Sciences, 669 F.3d at 454,

16   462 (4th Cir. 2012).

17       Here, the evidence shows that Y.M. could not satisfy the essential eligibility

18   requirements for any of the cheerleading programs at BHS, with or without

19   accommodations, since all prospective cheerleaders must "tryout" to be on the

20   cheerleading teams and attend a separate "tryout" to try and make the competition

21   cheer team.  Facts 17, 25.  At tryouts, each applicant performs a routine before a

22   panel of judges.  Applicants are scored based on a point system and evaluated on

23   their stunting skills, dance technique, precision and sharpness of movement,

24   rhythm and timing, showmanship, execution/ memory, voice projection,

25   energy/enthusiasm, confidence, as well as jumps and tumbling.  Those with the

26   highest scores are invited to join the Varsity cheer team, those with mid-range

27   scores are invited to join the JV cheer team.  Facts 18-19.  Competition

28   cheerleading requires a very high level of athleticism, strength, technique, and

- 8 -

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1  gymnastics.  Everyone on the competition cheer team must, at a minimum, be able

2  to stunt.  Facts 25-16.

3       Y.M. did not have the required skill set to make any of the cheerleading

4  teams at BHS.  Y.M.'s disability substantially limited her ability to communicate

5  (i.e., verbalize chants and cheers) and recall complex dance/cheer sequences.

6  Y.M. could pick up certain cues, move her body, and show energy in her face with

7  movements.  However, Y.M. does not have the mental capacity to remember

8  multiple steps to a dance routine or a cheer as speech is limited.  Even with the

9  District gratuitously providing a one-to-one cheer aide, Y.M. could not fully

10  perform a dance or cheer routine.  Fact 50.  As for competition cheer, Y.M.'s own

11  doctor and her own mother prohibited Y.M. from competing.  Facts 36, 44.  Thus,

12  the indisputable evidence shows that Y.M. could not satisfy the essential eligibility

13  requirements for any of the cheerleading programs at BHS, with or without

14  accommodations.

15            **2.    Y.M. Was Provided With Meaningful Access**

16       Section 504's "meaningful access" requirement is coextensive with the

17  concept of "equal opportunity" under Title II.  <u>Payan v. Los Angeles Cmty. Coll.

18  Dist.</u>, No. 2:17-CV-01697-SVW-SK, 2018 WL 6164269, at *12 (C.D. Cal. Oct.

19  16, 2018).  This is bolstered by the fact that the United States Supreme Court has

20  at times used the terms "meaningful" and "equal" interchangeably.  <u>See</u> <u>Alexander

21  v. Choate</u>, 469 U.S. 287, 306, 105 S. Ct. 712, 722, 83 L. Ed. 2d 661 (1985)

22  ("Because the handicapped have meaningful and equal access ...").

23       Here, providing equal access to cheerleading at BHS meant allowing Y.M.

24  to have the same access to cheerleading as all other students, by allowing her to

25  tryout for the team, which all students were required to do.  The District went

26  above and beyond that by allowing Y.M. to become a member of the sideline cheer

27  team without requiring her to tryout.  Fact 41.  Thus, the District provided Y.M.

28  with greater access to the cheer program than it provided to all other students.

1    There is no dispute that Y.M. was permitted to participate and did participate in the

2    sideline cheer program during all four years of high school.  Each year, she was

3    placed on the team without having to tryout.  Facts 40, 41.

4           Y.M.'s parents now allege that their daughter was not given *full* access to

5    the BHS cheer program because she was excluded from certain cheer practices

6    (i.e., stunting) and was not made a member of the school's competition cheer team.

7    These arguments are specious for multiple reasons.

8           First, it is well settled that exclusions due to physical limitations and safety

9    reasons are permissible bases for exclusions under the ADA.   Knapp v. Nw.

10   Univ., 101 F.3d 473, 483 (7th Cir. 1996) ("A significant risk of personal physical

11   injury can disqualify a person from a [program] if the risk cannot be eliminated.").

12   Here, everyone at BHS, as well as plaintiff's physician, had safety concerns with

13   Y.M. participating in stunting and tumbling because of her inability to follow

14   progressions, lack of motor skills and body control, as well as her spontaneous

15   reactions such as running toward team members while in the process of stunting or

16   aerial acrobatics, which put Y.M. and her teammates at risk of physical injury.

17   Fact 43.  Y.M.'s own doctor testified that, when she cleared Y.M. to participate in

18   cheerleading, she did so with the express understanding that Y.M. would not

19   participate in stunting.  Fact 44.  Thus, Y.M. did not participate in the

20   stunting/tumbling portion of practices, she did not attend cheer practices solely

21   dedicated to stunting and tumbling, and she did not engage in tumbling runs or

22   stunting at games or rallies.  Fact 47.  More importantly, these limitations were

23   observed by Y.M.'s coaching staff and the school who provided a cheer aide make

24   sure that Y.M. did not engage in activities during cheers and dance that may pose a

25   risk to Y.M. or her teammates. Thus, in light of the legitimate safety concerns and

26   the limitations imposed by Y.M.'s own doctor, the fact that Y.M. was excluded

27   from stunting/tumbling for legitimate safety reasons cannot serve as a basis for

28   liability.  Knapp, 101 F.3d at 483 ("A significant risk of personal physical injury

can disqualify a person from a [program] if the risk cannot be eliminated.").

As for competition cheer, the undisputed evidence shows that all cheerleaders on the competition cheer team were required to stunt.  Fact 26. Again, Y.M.'s own doctor prohibited her from stunting.  Fact 44.  And Y.M.'s mother specifically agreed that Y.M. would participate in cheer at BHS "as long as she doesn't compete."  Fact 36.  Thus, it was Y.M.'s own mother and her own doctor who prohibited Y.M. from competing, not the District.  Finally, the mere fact that Y.M. was not on competition cheer team is not evidence of discrimination because other non-disabled students were also excluded from the competition cheer team.  Fact 26.

### 3.    Y.M. Was Provided Reasonable Accommodations

Under 28 C.F.R. § 35.130(b)(7)(i), a "public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).  Here, the undisputed evidence shows that the District did modify the cheer program to allow Y.M. to meaningfully participate and that the District provided Y.M. with reasonable accommodations.

While Y.M. was on the BHS sideline cheer team, she was accommodated in several ways.  First and foremost, as discussed above, Y.M. was allowed to join the sideline cheer team without having to tryout, like every other student was required to do.  Fact 41.  Thus, the District modified its policies to facilitate Y.M.'s participation in cheer.  Second, the only accommodation requested by Y.M.'s parents was that Y.M. be provided with a cheer aide.  Fact 60.  The undisputed evidence shows that a one-on-one cheer aide was provided for Y.M. for practices and football games she attended.  Facts 53-59.  Y.M.'s parents contend that this accommodation was not reasonable because the cheer aide provided was not

"regular and consistent."   Fact 60.  However, the undisputed evidence shows otherwise.  A one-on-one cheer aide began working with Y.M. in July 2015, when she first joined the BHS sideline cheer team.  From July 2015 to July 2018, Y.M.'s cheer aide was Shalyn Haley.  From August 2018 to approximately February 2019 (i.e., when cheerleading essentially came to an end in Y.M.'s last year of high school), Y.M.'s cheer aide was Clotilde Velazquez.  When Ms. Haley and Ms. Velazquez were out sick or otherwise unavailable to serve as Y.M.'s cheer aide, BHS staff worked to locate and provide a substitute aide to work with Y.M.  The evidence shows that Y.M. was provided with a regular and consistent cheer aide during all four years that she cheered at BHS.  There were only a handful of occasions wherein BHS was unable to find a substitute aide last minute, due to staffing shortages that were beyond control.  Facts 53-57.

Moreover, the BHS cheer coaches accommodated Y.M. in a variety of other ways.  The cheer coaches modified their cheer practices to maximize Y.M.'s cheer time and set up special means of communicating with Y.M.'s parents, given Y.M.'s speech limitations.  They also created cheer videos so that Y.M. could get additional practice.  The BHS cheer teams modified their policies to help Y.M. feel more included.  For example, the coaches had a strict policy that all cheerleaders at BHS who missed a practice or did not fully memorize all cheers were prohibited from cheering at games.  They did not apply this policy to Y.M., who was allowed to miss practices, and was still allowed to cheer at all games.  The coaches also had a policy that required all BHS cheerleaders to complete a certain number of hours of community service in order to "letter" in cheerleading.  They did not require Y.M. to complete any community service and they still gave her a "letter" in cheerleading.  Facts 62-66.

///

///

///

**B.**   **Plaintiff Cannot Demonstrate that She is Entitled to the Relief**
**She Seeks.**

In plaintiff's Complaint for Damages, she seeks three separate remedies: (1)
monetary damages, (2) injunctive relief, and (3) declaratory relief.  As
demonstrated below, the plaintiff is not entitled to any of their relief.  Thus, her
entire action fails as a matter of law.

**1.**   **Plaintiff is Not Entitled to Monetary Damages**

Damages under section 504 and Title II of the ADA are only available in
certain circumstances.  "To recover monetary damages under Title II of the ADA
or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the
part of the defendant." Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1138 (9th Cir.
2001).  That standard can only be satisfied by showing that the public entity
"intentionally or with deliberate indifference fail[ed] to provide meaningful access
or reasonable accommodation to disabled persons." A.G., 815 F.3d at 1204.
"Deliberate indifference requires both knowledge that a harm to a federally
protected right is substantially likely, and a failure to act upon that the likelihood."
Duvall, 260 F.3d at 1139.

Here, the plaintiff is not entitled to monetary damages because she cannot
demonstrate that the District intentionally or with deliberate indifference failed to
provide Y.M. with meaningful access or reasonable accommodations.  As
demonstrated above, the District was altered to Y.M.'s parents' request that Y.M.
be provided with access to cheerleading and the District also accommodated Y.M.
in cheer by providing her with a one-on-one cheer aide.   The District cannot be
said to have been deliberately indifferent to these requests.  It considered the
requests and granted them by allowing Y.M. to participate in sideline cheerleading
program without having to tryout for the team and provided Y.M. with a one-on-
one cheer aide for all four years that she participated in cheer.

///

### 2.      Plaintiff is Not Entitled to Injunctive Relief

A plaintiff seeking injunctive relief lacks standing if he or she cannot "demonstrate 'a sufficient likelihood that he will again be wronged in a similar way[.]'" <u>Fortyune v. Am. Multi-Cinema, Inc</u>., 364 F.3d 1075, 1081 (9th Cir. 2004) (*quoting* <u>City of L.A. v. Lyons</u>, 461 U.S. 95, 111 (1983)).  Put another way, the plaintiff must establish a "real and immediate threat of repeated injury." <u>Id</u>. (*quoting* <u>O'Shea v. Littleton</u>, 414 U.S. 488, 496 (1974)).  Here, plaintiff cannot make such a showing.  It cannot be disputed that Y.M. graduated from high school in 2019 and she is no longer eligible to participate in the high school cheer program at BHS.  Facts 13, 132.  Thus, she cannot demonstrate real and immediate threat of repeated injury.

### 3.      Plaintiff is Not Entitled to Declaratory Relief

For the same reasons, plaintiff is not entitled to declaratory relief.  Similar to injunctive relief, declaratory relief is only available to declare future rights.  <u>Hiser v. Hickel</u>, 100 F.3d 962 (9th Cir. 1996); <u>Antelope Valley Allied Arts Ass'n v. Lancaster Redevelopment Agency</u>, No. CV1010039DSFFMOX, 2012 WL 13006002, at *3 (C.D. Cal. Feb. 6, 2012).  Where "declaratory relief is sought, a plaintiff must show a very significant possibility of future harm in order to have standing to bring suit." <u>Coral Const. Co. v. King Cnty.</u>, 941 F.2d 910, 929 (9th Cir. 1991), *overruled on other grounds by* <u>Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers</u>, 941 F.3d 1195 (9th Cir. 2019).  Where a "plaintiff's allegations are entirely focused on past events and injuries.  . . . declaratory relief . . . [is] unavailable." <u>Rodgers v. Tilton</u>, No. CIVS-07-2269WBSDADP, 2010 WL 3504903, at *4 (E.D. Cal. Sept. 7, 2010), report and recommendation adopted, No. CIVS07-2269WBSDADP, 2010 WL 3835857 (E.D. Cal. Sept. 29, 2010).  Because Y.M. has already graduated from high school and therefore cannot be harmed in the future by any alleged exclusion from her high school cheer program, declaratory relief is unavailable to her.

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**C.** **To the Extent Plaintiff's Claims are Based on Alleged Harassment and Bullying, Those Claims are Also Subject to Summary Judgment.**

Under the ADA and Section 504, schools "are properly held liable in damages only where they are deliberately indifferent to . . . harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." <u>Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.</u>, 526 U.S. 629, 650 (1999).  In the context of disability-based harassment claims, the following five-part test must be met to impose liability: (1) the plaintiff is an individual with a disability, (2) he or she was harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4) the defendant knew about the harassment, and (5) the defendant was deliberately indifferent to the harassment.  <u>S.S. v. E. Kentucky Univ.</u>, 532 F.3d 445, 454 (6th Cir. 2008); <u>S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.</u>, 819 F.3d 69, 76 (4th Cir. 2016).  To the extent plaintiff's ADA and Section 504 claims are based on alleged harassment, those claims are subject to summary judgment because she cannot establish several of these elements.

**1.** **Plaintiff Cannot Establish the Second and Third Elements**

According to plaintiff, the *only* instances of harassment and bullying she claims to have suffered are as follows:

- "July 23, 2015 - start of the problems concerning [Y.M.] being prohibited from cheerleading and being told by the Principal, Christiana Pierce and the Special Education Director, Carrie Roberg, that she would not be allowed to

cheer."[1]

- "July 23, 2015 through August 17, 2015 - various discussions took place concerning allowing YM to cheer and the requirement that Y.M. be provided with a Cheer Aide and Christiana Pierce and Carrie Roberg denying Y.M. this request,[2] causing Y.M. to miss numerous practices and games. These two parties then proceeded to tell Y.M.'s parents not to bring Y.M. to any practices or games or security would escort them off school grounds."[3]

- "August 27, 2015 - cheerleaders were invited to attend the 66ers baseball game and the cheerleaders were provided box seats in a restricted area where they were provided with food by the players and other perks. At this time, the District still refused to provide Y.M. with a Cheer Aide so Y.M.'s mother had to bring one with her when she brought Y.M. to this event.[4] While attending this event, Coach Taunie Penna demanded that Y.M.'s mother leave the seating area and advised Y.M's mother, Y.M. and Y.M.'s aide to go sit in the regular seating because the box seating was specifically reserved for cheerleaders."[5]

- "October 20, 2015 - Y.M. was denied the right to be a part of the cheer competition that was taking place during this time by Christiana Pierce, Martin Dusold and Taunie Penna. She was prohibited from participating

---

[1] This allegation is directly contradicted by the evidence that indisputably shows Y.M. was actually placed on the BHS sideline cheer team in July 2015 (Fact 83), as well as emails from Christina Peirce and Carrie Roberg to Y.M.'s parents specifically stating that Y.M. was permitted to cheer.  Fact 81.

[2] This allegation is directly contradicted by the evidence that shows Y.M. was provided with a one-on-one cheer aide and the aide began working with Y.M. on July 21, 2015.  Fact 83.

[3] This allegation is directly contradicted by the indisputable evidence.  Even if this was true, Y.M.'s parents are not disabled and are not plaintiffs in this case.  Thus, any alleged incidents of harassment or bullying against Y.M.'s parents is irrelevant.

[4] This allegation is directly contradicted by the evidence that shows Y.M. was provided with a one-on-one cheer aide and the aide began working with Y.M. on July 21, 2015.  Fact 83.

[5] Y.M.'s parents are not disabled and are not plaintiffs in this case.  Thus, any alleged incidents of harassment or bullying against Y.M.'s parents is irrelevant.

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

with the team in the competition.[6] Also, on this date, Taunie Penna offered Y.M. to purchase uniform warm-ups for $100.00 from a previous cheerleader and advised that the previous cheerleader's name would be removed from the jacket and Y.M.'s name would be replaced on it. After Y.M.'s mother paid for the warm-ups, the warm-ups were delivered but Y.M.'s name was not changed on them and Y.M. had to cheer with the name of the previous cheerleader on her jacket for several games during the football season."[7]

- "August 9, 2018 - Y.M. appeared for cheer practice but was told that there was not going to be any practice due to a scrimmage football game. However, they would not allow Y.M. to cheer with the rest of the team during the scrimmage football game.

- "August 29, 2018 - Y.M.'s mother paid $60.00 for certain graphics for Y.M.'s cheer box so that Y.M. would have graphics on her cheer box like the other cheerleaders. However, when the cheer boxes were presented at the August 30, 2018 football game, Y.M.'s box was the only box that did not have any graphics on the box while all of the other cheerleaders had graphics on their boxes."[8]

- "October 2018 - Breast Cancer Awareness month where all of the other cheerleaders were provided pink pom-poms for this event but Y.M. was not provided the pom-poms. Y.M. became so upset that she was not properly included in this event that she had to be taken home at half-time."[9]

- October 26, 2018 – "the school had a Senior Night . . . with a dedication to

---

[6] As explained above, Y.M.'s own mother and Y.M.'s own doctor prohibited Y.M. from participating in competition cheer.  Facts 36, 44.
[7] As demonstrated by the evidence, this was merely a misunderstanding, not an act of harassment.  Facts 93-97.
[8] As demonstrated by the indisputable evidence, this occurred because Y.M.'s mother admittedly failed to timely have Y.M.'s cheer box made, despite being provide with ample advance notice of the need to do so. Facts 100-104.
[9] The evidence shows that Y.M. had pink pom poms, she just failed to retrieve them from the cheer room prior to the game. Facts 106-108. The BHS staff made significant efforts to make sure this never happened again. Facts 109-111.

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

the class of 2019 to take place prior to the football game. As part of this event, the school sold picture books featuring senior athletes and cheerleaders. For each athlete or cheerleader, their picture would be placed in the book and next to the picture was supposed to be a short biography that listed each students' likes, hobbies, role models, favorite foods, favorite music and other information. Every student had this biography next to their picture in the picture book except Y.M. The space next to Y.M.'s photograph was completely blank. This greatly traumatized Y.M. and has devastated her and her parents."[10]

None of the foregoing allegations amount to actionable "harassment."  In a similar context, "harassment" is defined as epithets, derogatory comments, or slurs; assaults impeding or blocking movement, or any physical interference with normal movement, when directed at an individual; and derogatory posters, cartoons, or drawings.  See Haley v. Cohen & Steers Cap. Mgmt., Inc., 871 F. Supp. 2d 944, 957 (N.D. Cal. 2012).  And Merriam-Webster defines the word "harass" as "to create an unpleasant or hostile situation for, especially by uninvited and unwelcome verbal or physical conduct."  None of the alleged incidents outlined above could conceivably fit within these definitions or any other logical notion of harassment.  Indeed, the allegations above do not suggest that any District employee ever made any unwelcome or derogatory statements to Y.M. or directed any inappropriate conduct at Y.M.  The evidence shows that most of incidents alleged above were simply misunderstandings caused by miscommunications and/or Y.M.'s parents' own negligence and inattention.  Y.M. was not the only cheerleader who did not get to compete, she was not the only cheerleader that had issues with her cheer warmups, she was not the only cheerleader who had miscommunications with the cheer coaches about events, and

---

[10] The evidence shows that this occurred because Y.M.'s mother failed to timely turn in Y.M.'s biography information, despite the fact that she was given ample advanced notice. Facts 113-119.

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1   she was certainly not the only cheerleader who did not have the correct pom poms

2   at a game.  These things are common, run-of-the-mill challenges faced by every

3   high school cheerleader in America.  Fact 120.  Thus, no reasonable jury could

4   conclude that these incidents were orchestrated against and targeted at Y.M.

5   because of her disability.

6        Moreover, none of the allegations above constitute sufficiently "severe or

7   pervasive" harassment that altered the conditions of plaintiff's participation in

8   cheer or created an abusive environment.  In order to show that harassment was

9   sufficiently severe or pervasive, the plaintiff must show that the environment "was

10   both subjectively and objectively hostile."  <u>Galdamez v. Potter</u>, 415 F.3d 1015,

11   1023 (9th Cir. 2005).  "In making the objective determination, we look to all of the

12   circumstances, including the frequency, severity, and nature (i.e., physically

13   threatening or humiliating as opposed to merely verbally offensive) of the

14   conduct."  <u>Id.</u>  Again, none of the allegations set forth above can even be

15   considered "harassment," let alone "severe" harassment.  And no reasonable

16   cheerleader would be *offended* or *humiliated* by something such as not having pink

17   pom poms at a single game or having to wear a jacket with someone else's name

18   on it for a few days.  In light of the foregoing, plaintiff cannot conceivably

19   establish the second and third elements of her harassment claim.

20                **2.    Plaintiff Cannot Establish the Fifth Element**

21        In order to establish the fifth element, plaintiff must prove that the District

22   was deliberately indifferent to the harassment.  <u>S.S.</u>, 532 F.3d at 454.  The United

23   States Supreme Court has made clear that a school district may only be held liable

24   for "an official decision by [the district] not to remedy" the harassment.  <u>Davis</u>

25   <u>Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.</u>, 526 U.S. 629, 642 (1999).

26   Under the <u>Davis</u> standard, "[s]ection 504 does not require that schools eradicate

27   each instance of bullying from their hallways to avoid liability."  <u>Est. of Lance v.</u>

28   <u>Lewisville Indep. Sch. Dist.</u>, 743 F.3d 982, 996 (5th Cir. 2014).  Instead, a school

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

district will be liable for harassment only where its "response . . . or lack thereof is clearly unreasonable in light of the known circumstances." <u>Davis</u>, 526 U.S. at 648.

Here, plaintiff cannot show that the District was deliberately indifferent to any alleged harassment because there is no evidence that the District made an "official decision" not to remedy known harassment or that the District's response to any alleged harassment was unreasonable. In January 2019, Y.M.'s parents, Nancy Piper and Melvin Milton, lodged their first and only formal written complaints naming multiple District employees alleging discrimination of Y.M., including the accusations of harassment and bullying. Upon receiving these complaints, the Assistant Superintendent of Instructional Services, Tony Knapp, immediately initiated an investigation. He and a team of neutral District administrators investigated the allegations by interviewing several witnesses and reviewing voluminous documentary evidence. During the course of the investigation and interviews, the District did not uncover any instance of intentional discrimination, harassment, or bullying involving Y.M. Facts 74-78. Therefore, no reasonable jury could conclude that the District was deliberately indifferent to known harassment of Y.M.

**D.** **Some of the Alleged Conduct that Forms the Basis for Plaintiff's Claims is Barred by the Statute of Limitations.**

Since Section 504 and the ADA do not contain a statute of limitations, federal courts "borrow the statute of limitations applicable to the most analogous state-law claim." <u>Sharkey v. O'Neal</u>, 778 F.3d 767, 770 (9th Cir. 2015). In <u>Sharkey v. O'Neal</u>, the Ninth Circuit determined that California Government Code section 11135 "provides an almost identical state-law counterpart to Title II" of the ADA and, accordingly, held that its three-year statute of limitations applied to ADA Title II claims. <u>Id.</u> at 773. As for Section 504 claims, the Ninth Circuit has consistently approved of and applied California's one-year personal injury statute of limitations to Section 504 claims. <u>Daviton v. Columbia/HCA Healthcare Corp.</u>,

241 F.3d 1131, 1135–36 (9th Cir. 2001); <u>Douglas v. California Dep't of Youth Auth.</u>, 271 F.3d 812, 823 (9th Cir.), amended, 271 F.3d 910 (9th Cir. 2001).

Although state law is used to determine the statute of limitations period, "federal law determines when a cause of action accrues." <u>Alexopulos By and Through Alexopulos v. San Francisco Unified Sch. Dist.</u>, 817 F.2d 551, 555 (9th Cir.1987).  "Under federal law a cause of action accrues, and the statute of limitations begins to run, when a plaintiff knows or has reason to know of the injury that is the basis of the action."  <u>Id.</u>

Here, Y.M.'s mother, Nancy Piper, testified that she "knew" that Y.M. was being discriminated against as early as Y.M.'s freshman year of high school, which began in August 2015 and ended in June 2016.   Fact 134.   Thus, at a minimum, plaintiff's claims accrued in June 2016.  However, the instant action was not filed until June 6, 2019.  Thus, for plaintiff's ADA claim, any alleged discrimination that occurred prior to June 2016 is barred by the statute of limitations, which is three years.  And for plaintiff's Section 504 claim, any alleged discrimination that occurred prior to June 2018 is barred by the statute of limitations, which is only one year.

## VI.   <u>CONCLUSION</u>

Based on the foregoing, defendant respectfully requests that the Court grant the instant motion in its entirety and enter judgment in its favor.

DATED: March 12, 2021              CARPENTER, ROTHANS & DUMONT

                                    /s/ Danielle C. Foster
                          By: _____
                                    LOUIS R. DUMONT
                                    DANIELLE C. FOSTER
                                    Attorneys for Defendant